## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CCH ACQUISITIONS, LLC, et al.,**

      **Plaintiffs,**

   **v.**                           **Civil Action 2:23-cv-2983**

                                    **Magistrate Judge Kimberly A. Jolson**

**J&J&D HOLDINGS, LLC, et al.,**

      **Defendants.**

### <u>OPINION AND ORDER</u>

Defendants' Motion for Judgment on the Pleadings (Doc. 50) is before the Court. The Motion is **GRANTED**, and this action is **DISMISSED**.

### I.    BACKGROUND

At its heart, this case concerns an agreement to purchase a marijuana business. Plaintiff CCH Acquisitions, LLC owns land and buildings on a ten-acre parcel in Hanover, Michigan. (Doc. 1 at ¶ 10). On that property, Plaintiff Central Coast Horticultural, LLC operates a medical and adult-use marijuana cultivation business. (*Id.* at ¶¶ 11–12; Doc. 49-1 at 1). Plaintiffs William Fetterman and Susan H. Raker-Zimmerman are the entities' authorized agents. (*See* Doc. 1 at ¶¶ 3–4 (identifying these individuals only as residents of the state of Michigan); Doc. 49-1 at 15, 18 (including these individuals as agents of Plaintiffs CCH Acquisitions, LLC and Central Coast Horticultural, LLC, but saying nothing more)).

For its part, Defendant J&J&D Holdings, LLC, is a limited liability company registered in Ohio, whose authorized agent is Defendant Jeffrey Wade. (Doc. 49-1 at 18 (signature of Jeffrey Wade labeled as the authorized agent of Defendant J&J&D Holdings, LLC); *see also* Doc. 49-3 at

1 (identifying him as the LLC's CEO and president)). And although the parties provide little explanation of his role, Defendant Donovan Wade seemingly is affiliated with Defendant J&J&D Holdings, LLC. (*See, e.g.*, Doc. 1 at ¶ 7 (identifying him as an Ohio resident); Doc. 49 at 2 (same); Doc. 51 at 4–5 (discussing Defendant Donovan Wade's alleged contractual obligations)).

On March 8, 2023, the parties entered into an agreement (the "Purchase Agreement") to sell Plaintiffs' property and marijuana business to Defendant J&J&D Holdings, LLC for five million dollars. (Doc. 1 at ¶¶ 13–14). The sale was contemplated as all-inclusive, covering assets "of every kind and nature" related to "the operation of" Plaintiffs' marijuana business. (Doc. 49-1 at 1–2). Specifically, Plaintiffs contracted to sell their "marihuana inventory including . . . all marihuana plants, plant inventory, seeds, seedlings, [and] tissue cultures." (*Id.* at 2 (listing assets owned by the Plaintiffs), 20 (describing marijuana inventory)). The anticipated sale also included Plaintiffs' marijuana cultivation equipment; customer and vendor records; the business's goodwill, name, and branding; and other intellectual property. (*Id.* at 1–3 (listing all assets included in the sale)).

The Purchase Agreement permits termination of the contract in two scenarios. The Purchase Agreement requires Defendant Donovan Wade, before closing, to receive approval from the Michigan Cannabis Regulatory Agency (the "Agency") for "prequalification status as a medical and adult use marihuana license holder in Michigan." (Doc. 49-1 at 7 (cleaned up); *see also id.* (stating that Defendant J&J&D Holdings "shall cause Donovan Wade to apply" for that status by March 10, 2023); Doc. 1 at ¶¶ 15–16). If, however, the Agency does not approve Wade's application, either Plaintiffs or Defendants may terminate the Purchase Agreement through written notice. (Doc. 49-1 at 7–8).

After approval of Defendant Donovan Wade's prequalification application and before

closing, the Purchase Agreement requires Defendants to be "satisfied" with a due diligence review. (*Id.* at 8). This provision allows Defendants to investigate and examine Plaintiffs' property, business, and assets, including Plaintiffs' marijuana inventory. (*Id.* at 8–9). If unsatisfied after the review, Defendants have "the right to terminate [the Purchase Agreement] for any reason or no reason at all by providing [Plaintiffs] with written notice . . . on or before the last day of the Due Diligence Period." (*Id.* at 8). The Purchase Agreement also allows the parties to extend the due diligence review period if Plaintiffs' marijuana inventory fluctuates by more than twenty percent prior to closing or if Plaintiffs receive a large order of marijuana before the closing date. (*Id.* (discussing the extension period)).

The parties set closing to occur within thirty days of Defendant Wade obtaining prequalification approval as a marijuana license holder in Michigan. (Doc. 1 at ¶¶ 15–16). But he never received that status. And, according to Plaintiffs, he never even tried. They say Defendant Donovan Wade did not complete the Michigan Cannabis Regulatory Agency's required fingerprinting process. (*Id.* at ¶¶ 18–19, 20 (alleging the Michigan Cannabis Regulatory Agency ultimately "never received any fingerprints")). But for months, Defendants misled them into believing closing was on track. Plaintiffs represent that Defendant Jeffrey Wade even told them that Defendant Donovan Wade had been fingerprinted but that "unexplained issue[s]" occurred that required "re-fingerprint[ing]." (*Id.* at ¶¶ 19–21; *see also id.* at ¶¶ 45b–h). Then, on May 3, 2023, Defendants' former counsel sent Plaintiffs a "due diligence termination notice" that "purported to terminate" the Purchase Agreement. (*Id.* at ¶ 22). As a result, Defendants did not purchase Plaintiffs' land, business, or other assets. (*Id.* at ¶ 23).

Plaintiffs filed this diversity action on September 15, 2023, bringing breach of contract and related claims. (*See id.*). The parties consented to Magistrate Judge jurisdiction under

3

28 U.S.C. § 636(c).  (Doc. 28).  On each of their claims, Plaintiffs seek "an order requiring Defendants to specifically perform on the contract"; monetary damages "for the sum total . . . suffered by Plaintiffs"; and any other relief the Court deems "just and proper."  (Doc. 1 at 5–6, 8–9, 11–12).

Now, Defendants argue the case should be dismissed outright because the Purchase Agreement violates the Controlled Substances Act of 1970 (the "CSA"), 21 U.S.C. § 812.  (Doc. 50 at 1).  At the parties' request, the Court heard oral argument.  (Doc. 54).  The matter is fully briefed and ripe for review.  (Docs. 50, 51, 52).

## II.    STANDARD

The Federal Rules of Civil Procedure provide that, "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "Judgment may be granted under Rule 12(c) where the moving parties clearly establish that no material issue of fact remains to be resolved and that they are entitled to judgment as a matter of law."  *Williamson v. Recovery Ltd. P'ship,* No. 2:06-cv-292, 2010 WL 3769136, at *2 (S.D. Ohio Sept. 24, 2010) (citations omitted).  In examining a Rule 12(c) motion, the Court uses the same standard of review applied to a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Mixon v. State of Ohio*, 193 F.3d 389, 399–400 (6th Cir. 1999).  As such, the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief."  *Bishop v. Lucent Tech., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)).  While the Court's view on a Rule 12 motion is typically limited to the pleadings, *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020), the Court may also consider written

instruments attached to the pleadings, including contracts between parties. *See Smith v. City of Barberton*, No. 1:20-cv-584, 2021 WL 752595, at *3 (N.D. Ohio Feb. 26, 2021); (Doc. 49-1 (the parties' Purchase Agreement, attached to Defendants' Amended Answer)).

## III.   DISCUSSION

Defendants' argument is straightforward.  The Purchase Agreement, they say, violates federal law, bringing this case to an end.  Plaintiffs, relying on Michigan law and changing attitudes towards marijuana, say otherwise.

### A.     Enforcement of Illegal Contracts

As a rule, federal courts may not assist "'in any way towards carrying out the terms of an illegal contract.'"  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (quoting *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899)); *see also Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("[T]he effect of illegality under a federal statute is a matter of federal law . . . even in diversity actions in the federal courts[.]"); *Jackson Purchase Rural Elec. Coop. Ass'n v. Loc. Union 816, Int'l Broth. of Elec. Workers*, 646 F.2d 264, 267 (6th Cir. 1981) ("[O]ne who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.").

But courts distinguish between cases where parties seek to enforce "a promise that was legal, even though the promise was part of an agreement containing a separate, illegal provision," and cases where the promise "was deemed illegal in and of itself."  *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 699 (6th Cir. 2017) (comparing *Kelly*, 358 U.S. at 520, with *Kaiser Steel Corp.*, 544 U.S. at 79–82).  Ultimately, courts decline to enforce contracts "only if 'the judgment of the Court would itself be enforcing the *precise conduct made unlawful*' by the federal statute."  *Id.* at 698 (quoting *Kelly*, 358 U.S. at 520)

(emphasis in original).

The distinction matters. A court may enforce a legal promise without violating the law, even where separate, unrelated parts of the contract are unlawful. *See, e.g.*, *Hemlock Semiconductor Operations, LLC*, 867 F.3d at 699–700 (enforcing a provision that was legal "in isolation"). The same cannot be said in cases where parties ask courts to ignore established law, accept illegal conduct, and reward parties accordingly. In those situations, by enforcing the illegal promise, courts ratify unlawful conduct and become complicit in the parties' illicit transaction.

The doctrine against enforcement prevents exactly that. At its core, it protects courts from engaging in illegal activities. *Sensoria, LLC v. Kaweske*, 581 F.Supp.3d 1243, 1259 (D. Colo. 2022) (discussing that courts cannot "tolerate one violation of the law . . . to redress others").

## B.     Breach of Contract (Claim I)

When the parties signed the Purchase Agreement, the use, cultivation, and distribution of marijuana had been legal in Michigan for over four years. *See, e.g.*, MCL 333.27951 *et seq*. (decriminalizing, in late 2018, the use and possession of marijuana for adults over 21 years old); MCL 333.26421 *et seq.* (legalizing medical marijuana); (Doc. 49-1 (signed in March 2023)). But for many more years, marijuana had been—and continues to be—criminalized under federal law. *United States v. Walsh*, 654 F. App'x 689, 695 (stating marijuana is "contraband for *any* purpose" under the CSA) (quoting *Gonzales v. Raich*, 545 U.S. 1, 14 (2005)) (emphasis in original). The CSA's text is clear. It designates marijuana as a Schedule I controlled substance and prohibits individuals from manufacturing, distributing, or possessing it with the intent to distribute. *See* 21 U.S.C. § 841(a)(1). The statute further outlaws any conspiracy or attempt to do so. *1240 S. Bannock, LLC v. Siem*, No. 2:21-cv-183, 2022 WL 2161386, at *6 (W.D. Mich. May 27, 2022) (citing 21 U.S.C. § 846 and 18 U.S.C. § 2(a)), *report and recommendation adopted*, No. 2:21-cv-

183, 2022 WL 2158384 (W.D. Mich. June 15, 2022).  Practically, this means that although marijuana operations are legal under Michigan state law, they remain illegal under federal law. *See Gonzales,* 545 U.S. at 29–33; *United States v. Lundy*, No. 20-6323, 2021 WL 5190899, at *1 (6th Cir. Nov. 9, 2021) ("Despite movements to decriminalize it or legalize it on the state level, marijuana remains a controlled substance at the federal level.").

It follows that the parties' Purchase Agreement is an illegal contract under the CSA.  To start, the agreement obligates Defendant Donovan Wade to obtain approval for medical and adult-use marijuana licenses in Michigan.  (Doc. 49-1 at 7–8).  Once he does so, the agreement allows Defendant J&J&D Holdings, LLC to buy Plaintiffs' marijuana operation, including their inventory, equipment, land, and other assets.  (*Id.* at 1–3, 2, 20).  This includes $500,000-worth of marijuana plants.  (*Id.* at 2; Doc. 51 at 10).  Taken together, those provisions contemplate that Defendants (1) buy Plaintiffs' property and business; and (2) continue cultivating, distributing, and possessing marijuana under Defendant Donovan Wade's state marijuana licenses.  Those intentions violate the CSA.  *See* 21 U.S.C. § 841(a)(1) (prohibiting individuals from cultivating or distributing marijuana); 21 U.S.C. § 846 (criminalizing conspiracies or attempts to violate the CSA).  Still more, not only did the parties aim to transfer a marijuana cultivation business, they contracted to sell marijuana plants.  (Doc. 49-1 at 2, 20).  That, too, is illegal under the CSA.  *See AgriAuto Genetics, LLC v. Harris*, No. 22-cv-273, 2023 WL 8371940, at *3 (E.D. Okla. Dec. 4, 2023) (finding a contract "directly related to the . . . selling of marijuana" violative of the CSA).

Even so, Plaintiffs say the legal landscape of marijuana has changed enough that the Court should ignore the CSA.  (Doc. 51 at 7).  Plaintiffs point to a 2024 Notice of Proposed Rulemaking that seeks to reclassify marijuana as a Schedule III substance.  (*Id.* (citing Schedules of Controlled Substances: Rescheduling of Marijuana, 89 Fed. Reg. 70148 (proposed May 21, 2024))).  But

Plaintiffs' argument is premature because the rescheduling of marijuana has not come to fruition. *See* Schedules of Controlled Substances, 89 Fed. Reg. at 70149 (saying a hearing on the proposed rescheduling would occur on December 2, 2024).  In fact, the United States continues to prosecute marijuana crimes under the CSA.

Within the last six months, no fewer than three individuals have been convicted in this District of marijuana-related offenses under the CSA.  They face years in federal prison.  *See United States v. Savage*, Case No. 2:22-cr-222(4) (S.D. Ohio Aug. 19, 2024) (Doc. 248 at 10–11) (convicting the defendant of engaging in a conspiracy to distribute 1,000 kilograms or more of marijuana); *United States v. Abate*, Case No. 2:22-cr-222(2) (S.D. Ohio Aug. 19, 2024) (Doc. 248 at 1–2) (same); *United States v. Binford*, Case No. 1:22-cr-85(1) (S.D. Ohio Feb. 3, 2025) (Doc. 161 at 1–2 (convicting the defendant of conspiring to distribute and possess with the intent to distribute five kilograms or more of marijuana); *see also* 21 U.S.C. § 841(b)(1)(A)(vii), 21 U.S.C. § 841(b)(1)(D) (outlining sentence provisions for marijuana); *United States v. Hernandez-Carrillo*, No. 2:08-cr-55(2), 2022 WL 633568, at *3 (S.D. Ohio Mar. 4, 2022) (denying a compassionate release motion and noting that if defendant were convicted today of the same marijuana-related conspiracy, "the court would still be required to impose a life sentence").

Put bluntly, when it comes to federal legalization or decriminalization of marijuana, the law is not there yet—and may never be.  As it stands, the Purchase Agreement plainly violates federal law.  All that remains is the extent to which its illegality bars Plaintiffs' requests for relief.

### 1.    *Specific Performance*

Largely relying on an opinion from the Tenth Circuit, Plaintiffs maintain that the Court can order specific performance of the Purchase Agreement, despite its unlawfulness.  (Doc. 51 at 7–8 (discussing *Bartch v. Barch*, 111 F.4th 1043, 1049, 1055 (6th Cir. 2024))).  Plaintiffs are wrong.

In *Bartch*, the Tenth Circuit opined that relief could be available in some marijuana-related disputes. 111 F.4th at 1055. But it also vacated a post-judgment enforcement order requiring the defendants to sell a marijuana business and give the proceeds to the plaintiff. *Id.* at 1061–63. The panel questioned whether the order "effectively require[d]" the defendants to violate the CSA by forcing them to engage in marijuana activities to maintain the business's value until the sale. *Id.* at 1062. To determine whether enforcement of the order would require the court to "carry[] out the terms of an illegal contract," the Tenth Circuit remanded the issue for further evidentiary development. *Id.* at 1063 (quoting *Kaiser Steel Corp.*, 455 U.S. at 77).

A more developed record is not needed here. Specific performance of the Purchase Agreement would necessarily violate the CSA. For example, if the Court ordered Defendants to purchase Plaintiffs' business, the Court would facilitate future marijuana operations. *See 1240 S. Bannock, LLC*, 2022 WL 2161386, at *6 (declining to enforce a marijuana-related contract where its clear purpose was to allow others to violate the CSA). Perhaps even more troublesome, the Court would have to order Defendants to purchase $500,000-worth of marijuana plants. *See* 21 U.S.C. § 841(a) (outlawing distribution of controlled substances like marijuana); *see also AgriAuto Genetics*, 2023 WL 8371940, at *3 (dismissing a claim for breach of contract based on the growing and selling of marijuana). Consequently, the Court easily rejects Plaintiffs' request for specific performance.

### 2. Damages

If specific performance is out, Plaintiffs alternatively ask the Court to award damages for their breach-of-contract claim. (Doc. 51 at 8–11). Once more, the Court finds it cannot.

In cases involving marijuana-related disputes, courts tread carefully when considering requests for damages. Ultimately, what matters is whether an award of damages would "compel

a violation of the law." *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 555 (6th Cir. 2004). More often than not, courts find marijuana-related contracts unenforceable and decline to grant any relief. *See, e.g.*, *1240 S. Bannock, LLC*, 2022 WL 2161385, at *6 (holding that damages were unavailable for a failed purchase agreement for property where the property was intended to host a marijuana business); *J. Lilly, LLC v. Clearspan Fabric Structures Int'l, Inc.*, No. 3:18-cv-1104, 2020 WL 1855190, at *11 (D. Or. Apr. 13, 2020) (declining to award damages for lost profits from a marijuana business); *Next Step Advisors LLC v. True Harvest Holdings Inc.*, 641 F.Supp.3d 655, 658 (D. Ariz. 2022) (finding that enforcement of an agreement to purchase a marijuana business would violate the CSA). Rarely, courts determine that damages can be awarded in a way that does not transgress the CSA. *See Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215, at *1, 7–9 (N.D. Cal. Nov. 2, 2016) (noting relief could be granted in a case involving the sale of consulting and hydroponic retail businesses tangentially related to marijuana); *One Triple Two, LLC v. Divel*, No. 22-2027, 2024 WL 2155058, at *5 (D. Md. May 13, 2024) (finding a contract for the sale of a business and other assets enforceable, even though it was related to marijuana, but highlighting that the contract was not "for the sale of cannabis").

Here, Plaintiffs' request for damages stems from its allegations that Defendants breached the Purchase Agreement by (1) failing to have Defendant Donovan Wade apply for Michigan marijuana licenses; and (2) not purchasing Plaintiffs' marijuana-related property, business, and assets. (Doc. 1 at ¶¶ 25–30; Doc. 51 at 4–5). As discussed, this is precisely the type of "conduct made unlawful by the [CSA]." *Hemlock Semiconductor Operations, LLC*, 867 F.3d at 698. So, if the Court granted relief based upon these allegations, it would "give legal effect to [the parties'] illegal acts" and enforce their unlawful agreement. *Jackson Purchase Rural Elec. Coop. Ass'n*,

646 F.2d at 268 ; *see also McMullen*, 174 U.S. at 660 ("[When] the cause of action grows directly out of the illegal contract . . . if the court distributes the profits, it enforces the contract."); s*ee also Hurd v. Hodge*, 334 U.S. 24, 34–35 (1948) ("The power of the federal courts to enforce the terms of a private agreement is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in . . . federal statutes[.]").

Still, Plaintiffs argue a damages award would not violate the law if the funds were to come from a non-marijuana-related source. (Doc. 51 at 8–10). But Plaintiffs rely on cases that do not support their ask. (*Id.*). In two, the courts even concluded that the requested relief was at odds with the CSA. *See Shulman v. Kaplan*, 58 F.4th 404, 409–11 (9th Cir. 2023) (finding marijuana businesses cannot recover damages under 18 U.S.C. § 1961 *et seq.*); *Bartch*, 111 F.4th at 1060–62 (remanding an order requiring the sale of a marijuana business to determine if it effectively violated the CSA). And, in the others, the underlying contracts had little to do with marijuana. *Mann*, 2016 WL 6473215, at *1, 7 (explaining the businesses provided consultation services and sold hydroponic equipment but did not grow or distribute marijuana); *One Triple Two, LLC*, 2024 WL 2155058, at *2, 5 (noting the contract was not "for the sale of cannabis" and required the plaintiffs to cease all marijuana cultivation before closing). Clearly, the same is not true here. (Doc. 49-1 at 1–2 (contracting to sell all property and assets used to operate Plaintiffs' marijuana business)).

Perhaps recognizing the constraints marijuana places on relief, Plaintiffs tack and ask for damages for their non-marijuana assets, like their "actual real property, the businesses' equipment, and the businesses' goodwill." (Doc. 51 at 10). But these pieces cannot be separated from the whole. *Cf. Klukavy v. United Nat'l Ins. Co.*, 654 F.Supp. 622, 627 (E.D. Mich. 1987) (discussing when legal provisions of contracts can be severed from illegal ones and enforced). The Purchase

Agreement's purpose, as shown in every provision, was to sell and carry on a marijuana business. (Doc. 49-1 at 7–8). To enforce any part of the Purchase Agreement, the Court would have to stamp its approval on the parties' unlawful activities.

Plus, Plaintiffs have not offered a way for the Court to determine damages without valuing an illegal business. (Doc. 51 at 8–11). Nor could they. To value the land, for instance, the Court would have to consider that marijuana is a cash crop cultivated on the property. (*See, e.g.*, Doc. 49-1 at 1 (describing that the land and the buildings on that land are used to grow marijuana)). Similarly, much of the equipment discussed in the Purchase Agreement is used to cultivate marijuana or operate a business that grows and distributes marijuana. (*See id.* at 2–3). And, of course, the value of the business's goodwill necessarily depends on its status as a marijuana operation. Ultimately, every asset in the Purchase Agreement is entangled with marijuana, as the Purchase Agreement's plain text shows. (*See id.* at 1 (describing Plaintiffs' business that "operates as" a medical and adult-use marijuana grower), 2 ("[Plaintiffs] shall sell . . . and [Defendant J&J&D Holdings, LLC] shall purchase . . . all of the Hard Assets and Other Assets of every kind and nature, which relate to, or are used or held for use in connection with, the operation or conduct of the Business.")). The Court cannot calculate the value of these assets without becoming complicit in the parties' illegal agreement. *See, e.g., Next Step Advisors LLC*, 641 F.Supp.3d at 658 (finding damages unavailable for the sale of a marijuana business because managing relief through an appointed receiver would still violate the CSA); *Sensoria, LLC*, 581 F.Supp.3d at 1261 (noting discovery on compensatory damages would require the court to "separate[e] out legitimate income from [a marijuana business's] revenue" and concluding those efforts would violate federal law).

To that point, marijuana's illegality was no secret to the parties when they signed the

12

Purchase Agreement in March 2023. (Doc. 49-1 at 18). Precedent was clear that federal courts may reject marijuana-adjacent contracts, especially those involving sales of marijuana businesses and plants. *See, e.g.*, *Gonzales*, 545 U.S. at 27 (finding, in 2005, that marijuana is federally "designate[d] . . . as contraband for *any* purpose," even if it is legal under state law); *1240 S. Bannock, LLC*, 2022 WL 2161386, at *4–6 (holding, in the Western District of Michigan in 2022, that damages could not be awarded for a "failed real estate transaction that had the purpose of allowing the sale of marijuana on the property"); *Sensoria, LLC*, 581 F.Supp.3d at 1258–61 (concluding in 2022 that the court could not award relief in a case involving a business that cultivates and sells marijuana); *Next Step Advisors, LLC*, 641 F.Supp.3d at 658 (declining to enforce an agreement in 2022 for the sale of a "cannabis cultivation and distribution business"). By entering into the Purchase Agreement anyway, the parties took a risk. And by choosing to file this action in federal court, Plaintiffs took another.

When parties make illegal contracts, "the law will leave [them] as it finds them." *McMullen*, 174 U.S. at 670. The parties agreed to a contract that violates the CSA—a gamble that appears not to have played out in Plaintiffs' favor. Their breach of contract claim is **DISMISSED**.

## C. Remaining Claims (Claims II–VII)

Plaintiffs also raise miscellaneous tort and contract claims, including promissory estoppel, fraudulent misrepresentation, innocent misrepresentation, unjust enrichment, silent fraud, and tortious interference with a contract. (Doc. 1 at ¶¶ 35–76). Again, Defendants argue these claims must be dismissed. (Doc. 50 at 12–16). In Plaintiffs' briefing, Defendants' arguments go unanswered. (*See generally* Doc. 51). In fact, Plaintiffs hardly mention their non-breach-of-contract claims. (*Id.* at 5 (listing the claims), 7–11 (making no arguments for these claims)). Consequently, Plaintiffs have forfeited their remaining claims. *See Threat v. City of Cleveland*, 6

F.4th 672, 681 (6th Cir. 2021) (finding a claim forfeited when the party failed to respond to arguments raised against it in a motion for judgment on the pleadings); *KSA Enters., Inc. v. Branch Banking and Tr. Co.*, 761 F. App'x 456, 463 (6th Cir. 2019) ("A party's failure to respond to an argument raised in a motion to dismiss results in the forfeiture of that argument.").

And, even if the Court could put forfeiture aside, Plaintiffs do not explain how the Court could award relief without violating federal law.  Notably, Plaintiffs seek the same relief for their remaining claims as their breach-of-contract claim.  (Doc. 1 at 8, 9, 11, 12).  But again, the Court cannot order specific performance or otherwise get in the weeds of Plaintiffs' marijuana business without transgressing the CSA.

Still more, Michigan law poses unsurmountable hurdles for Plaintiffs' remaining claims. Their promissory estoppel and unjust enrichment claims stem from the illegal Purchase Agreement.  Under Michigan law, claims arising out of an unenforceable contract are barred. *Cunningham v. MEC Enters., Inc.*, No. 10-13409, 2012 WL 13005418, at *6 (E.D. Mich. May 29, 2012).  Likewise, Plaintiffs' misrepresentation and silent fraud claims are fatally intertwined with the breach of contract claim.  (Doc. 1 at ¶¶ 45–47, 53, 62–68).  Again, Michigan law closes the door.  When "a plaintiff wishes to sue for a defendant's failure to abide by a promise, the plaintiff can resort to a breach of contract claim" only.  *1240 S. Bannock, LLC*, 2022 WL 2161386, at *6. Because these claims are founded upon Defendants' failure to perform the contract, they fail at the pleading stage.  *See id.* (dismissing fraud and silent fraud claims because they could not be "disentangle[d]" from the breach of contract claim); *Miller v. Joaquin*, 431 F.Supp.3d 906, 918 (E.D. Mich. 2019) ("Acting so as to breach a contract is a breach of contract, it is not a fraudulent misrepresentation of fact actionable under Michigan law."); *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (discussing that future promises are contractual and cannot form

the basis of fraud claims).

For all of these reasons, Claims II–VII are **DISMISSED**.

## IV.    CONCLUSION

Defendants' Motion for Judgment on the Pleadings (Doc. 50) is **GRANTED**.  This action is **DISMISSED**, and the Clerk is **DIRECTED** to enter judgment in favor of Defendants.

IT IS SO ORDERED.


Date:   February 25, 2025                            /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE